**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Renee Marie Milton Chabot</u>

    **v.**                                        Civil No. 13-cv-126-PB
                                                Opinion No. 2014 DNH 067
<u>U.S. Social Security Administration,</u>
<u>Acting Commissioner</u>


<u>MEMORANDUM AND ORDER</u>

Renee Chabot seeks judicial review of a ruling by the
Commissioner denying her application for disability insurance
benefits ("DIB") and supplemental security income ("SSI").
Chabot claims that the Administrative Law Judge ("ALJ") erred in
considering the severity of several of her impairments and
because his Residual Functional Capacity ("RFC") finding was not
supported by substantial evidence.  For the reasons set forth
below, I deny Chabot's request and affirm the decision of the
Commissioner.


**I.   <u>BACKGROUND</u>**[1]

**A.   <u>Procedural History</u>**

On March 31, 2010, Chabot applied for DIB and SSI under
Titles II and XVI of the Social Security Act, alleging a

---

[1] The background information is taken from the parties' Joint
Statement of Material Facts (Doc. No. 13).  Citations to the
Administrative Transcript are indicated by "Tr."

disability onset date of January 15, 2009.  The Commissioner denied Chabot's applications on September 29, 2010.  Chabot then requested a hearing before an ALJ, which was held on October 13, 2011.  Chabot, who was represented by counsel, testified at the hearing, as did a vocational expert ("VE").  On November 4, 2011, the ALJ issued a decision finding that Chabot was not disabled under the Social Security Act.  On January 30, 2013, the Appeals Council denied Chabot's request for review, thereby making the ALJ's decision the final agency decision.  Chabot timely filed the instant action on January 30, 2013.

**B.  Medical History**

Chabot was forty-four years old on her alleged onset date. She has an associate's degree and had previously worked as an office manager, collections representative, gas station cashier, store manager, and receptionist.  Chabot claims that she became disabled in 2009 due to the gradual worsening of a variety of physical impairments, with her chief complaints involving her lower back, right shoulder, right wrist, right hip and headaches.

1.  <u>Treatment Records</u>

Chabot's medical record is largely composed of notes from visits to Dr. Margaret Tilton, M.D., referrals to specialists, emergency room visits, and physical therapy.

### a.  Dr. Tilton

Upon her doctor's recommendation,[2] Chabot began treatment with Dr. Tilton, a physiatrist,[3] in October 2009.  Chabot initially complained of back pain and numbness in her right thigh.  Tests produced lateral hip pain with a full range of hip motion.  After reviewing a lumbar spine MRI showing moderate disc protrusion,[4] Dr. Tilton opined that Chabot's lower back pain was likely a combination of discogenic and mechanical factors. Dr. Tilton also diagnosed right hip trochanteric bursitis[5] and iliotibial band syndrome,[6] and possibly mild right SI joint

---

[2] Chabot's primary care physician, as noted throughout her medical record, is Dr. Heidi Crusberg.  See, e.g., Tr. at 614. Neither party appears to rely upon Dr. Crusberg's opinions of Chabot's ailments.

[3] A physiatrician is a "physician who specializes in . . . rehabilitative medicine" and physical therapy.  Stedman's Medical Dictionary 1493 (28th ed. 2006).

[4] Disc protrusion is synonymous with a herniated disc and is the "protrusion of a degenerated or fragmented invertebral d[isc]." Id. at 549.

[5] The trochanter is a "bony prominence . . . near the proximal end of the femur."  Id. at 2035.  Bursitis is caused by the formation of bursae, which are "closed sac[s]" that contain fluid "usually found or formed in areas subject to friction." Id. at 280-81.

[6] The iliotibial band stretches from the "broad, flaring portion of the hip bone" to the shin bone.  Id. at 947, 1989.

dysfunction.[7]  Dr. Tilton noted upper lumbar[8] sensory deficits, but found no other significant signs of radiculopathy.[9]  On October 8, 2009, Chabot received a right hip cortisone injection and reported at a follow-up appointment that it "was extremely helpful in relieving her lateral hip pain."

Dr. Tilton also focused on Chabot's right shoulder pain and stiff neck.  Examination found marked limitations to Chabot's range of motion, tenderness in the facet joints, and paresthesia in the thoracic outlets.[10]  A cervical spine x-ray revealed "anterior spurring at C5 and C6," which the radiologist described as moderate degenerative change.  Dr. Tilton diagnosed Chabot with, in relevant part, "probable cervical spondylosis with cervical myofascial pain syndrome[;][11] right thoracic

---

[7] The sacroiliac (SI) joint joins the pelvis and lower back to the hip bone.  Id. at 947, 1714.

[8] The lumbar region relates to the lower back, or "the part of the back and sides between the ribs and the pelvis."  Id. at 1121.

[9] Radiculopathy is a "disorder of the spinal nerve roots."  Id. at 1622.

[10] Paresthesia is a "spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking)."  Id. at 1425.

[11] Cervical spondylosis involves "degenerative changes in the invertebral disk and annulus and formation of bony osteophytes, which narrow the cervical canal . . . causing radiculopathy and sometimes myelopathy . . . pain may predominate with radicular signs . . . usually between C5 and C6 or C6 and C7."  The Merck

outlet syndrome[;]<sup>[12]</sup> right shoulder impingement[; and] right hip trochanteric bursitis, improved post cortisone injection."  Tr. at 419.  On December 1, 2009, Chabot underwent electrodiagnostic testing for right hand paresthesia, revealing symptoms "consistent with a clinical diagnosis of moderate carpal tunnel syndrome."[13]  Tr. at 431.

On January 5, 2010, Chabot reported a severe headache, stronger than a usual migraine and lasting the entire day.  Dr. Tilton noted that Chabot "dug out her old resting wrist splint and has been wearing that to bed at night," which reduced her right hand paresthesia.  Tr. at 341.  Examination found normal muscle tone and strength in her right upper extremity and mild tenderness in her wrist, but with a full and pain free range of motion.  A wrist x-ray revealed normal alignment without fracture or dislocation and soft tissues within normal limits.

On April 12, 2010, Chabot presented with neck pain in her

---

Manual 1893-94 (18th ed. 2006).

[12] Thoracic outlet syndromes "are a group of poorly defined disorders characterized by pain and paresthesia[] in the hand, neck, shoulder, or arms. . . . [d]iagnostic techniques have not been established.  Treatment includes physical therapy, analgesics, and, in severe cases, surgery."  Id. at 1908.

[13] Carpal tunnel syndrome is a "compression of the median nerve as it passes through the carpal tunnel in the wrist."  Id. at 334-35.

upper cervical spine.  She noted occasional headaches that
sometimes evolved into migraines, but Dr. Tilton noted that
"she is usually able to abort that."  Her right wrist remained
"workable," without significant pain.  Examination found at most
mild point tenderness over the spinous processes, and no
paraspinal tenderness or spasm.  Chabot's shoulders were
"markedly protracted," with trigger points[14] in the upper
trapezius musculature and a diminished range of motion in the
right shoulder range.  Chabot's gait was "somewhat antalgic;"
she had difficulty rising to an upright posture but her gait
normalized after several steps.  An x-ray showed chronic
degenerative changes to her cervical spine.

Between May 24, 2010 and July 2010, Chabot visited Dr.
Tilton multiple times presenting with recurrent flare-ups of
right hip pain, caused in part by her attempts to walk more
frequently, in twenty minutes intervals three times per week.
Her cervical symptoms remained stable, and Dr. Tilton
administered a trigger point injection in Chabot's shoulder.
Chabot later reported that the injection had been helpful,
leaving her more comfortable, though not fully resolving her

---

[14] Trigger points are muscular areas where "a relatively small
input [of pain] turns on a relatively large output," meaning
that unexplained pain can radiate from these points to broader
areas.  Stedman's, supra note 3, at 2032.

pain.  Dr. Tilton also administered "right AC joint cortisone injections."  On a follow-up visit Chabot noted that her right shoulder was now pain free, though she continued to experience centralized neck pain.

On August 12, 2010, Chabot reported lower back pain, which she rated an "11 out of 10."  Examination showed bilateral paraspinal spasm with no tenderness over the spinous process and no SI joint tenderness.  Straight leg raise testing was negative and manual muscle testing was five out of five, with moderate tenderness over the right hip greater trochanter.

On October 4, 2010, Chabot complained of headaches lasting up to twenty-four hours associated with "photophobia, phonophobia, and nausea and vomiting."  On November 15, 2010, Chabot reported "snapping" sensations and neck pain leading to weekly migraines.

On February 7, 2011, Dr. Tilton noted "exquisite" tenderness in Chabot's right hip trochanter.  Her range of hip motion was intact, her gate was normal, and her strength was intact in her upper and lower extremities.  Dr. Tilton diagnosed an exacerbation of greater trochanteric bursitis and performed a cortisone injection in Chabot's right trochanteric bursa.

On May 25, 2011, Chabot presented with more right hip difficulties.  Noting that cortisone injections offered only

temporary benefits, Dr. Tilton said that she would like "to get her back involved with physical therapy," starting in an aquatic environment.  On June 29, 2011, Chabot again presented with right hip pain.  Examination revealed that her hip motion was functionally intact, and "focal and exquisite tenderness [wa]s noted over the greater trochanter on the right side extending distally into the iliotibial band."  Her strength was five out of five but her gait was antalgic, with Chabot favoring her lower left extremity.  Dr. Tilton performed an ultrasound of the right greater trochanteric bursitis and observed that it "appears to be more of a soft tissue injury."  The ultrasound revealed "trochanteric bursitis and gluteus medius enthesopathy."[15]  Based on these results, Dr. Tilton performed another right hip cortisone injection.

On September 6, 2011, Chabot reported right hip pain manifesting in sharp shooting pains and diminished tolerance for walking.  She reported that her recent injection was unhelpful, described her neck pain as "severely worse," and reported increasingly frequent migraines.  Chabot's hip range of motion was functionally intact, her strength was five out of five, and her gait was normal.  Dr. Tilton expressed that she "would like

---

[15] Enthesopathy is "[a] disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules."  Id. at 649.

to rule out the hip as being the etiology for her complaints of right-sided pain.  I think that SI dysfunction and possible low back could be contributing factors."

### b.  Referrals to Specialists

On October 23, 2009, Dr. Tilton referred Chabot to a doctor of osteopathic medicine.  Chabot reported constant lower back pain affecting her right thigh that was made worse by twisting, walking, and prolonged sitting.  Examination found a good range of motion in "lumbar flexion," a negative straight leg raising test, and pain on palpation of her lumbar paraspinal musculature, but no pain on palpation of her lumbar spinous processes.  Chabot had five out of five strength throughout her lower extremities, and decreased sensation to pinprick in her right L4, L5, and S1 dermatomes.  The doctor opined that Chabot had "lumbar radiculitis, low back pain, and lumbar myosfascial pain."  Tr. at 487.

On November 2, 2009, a spinal specialist administered a lumbar epidural steroid injection.  After she reported sixty percent relief from the injection, Chabot received a second injection on November 23, 2009.  Chabot reported no relief from this second injection, and was given a third injection on December 21, 2009.

On March 11, 2010, Chabot underwent a neurological

examination with another specialist.  Her cervical spine showed
full and normal flexion and extension, and she exhibited a
normal gait pattern and an ability to walk appropriately on her
heels and toes.  The specialist found five out of five strength
throughout with normal sensations and reflexes.  After reviewing
Chabot's cervical spine x-rays, the specialist diagnosed
cervical degenerative disc disease without any discrete
neurological symptoms.

On November 4, 2010, Chabot returned to the spinal
specialist, reporting a gradually worsening lower back pain that
radiated to her thighs and was aggravated by standing, walking,
and sitting, but relieved by medication.  Noting Chabot's
seventy-five percent pain relief from prior epidural injections,
the specialist administered another injection.

On November 17, 2010, Chabot visited a headache specialist
and reported that she began getting migraines at the rate of one
to two per year beginning at age eighteen.  In October 2010, her
"neck snapped," leading to weekly migraines, along with daily
headaches that were treatable by Tylenol.  The doctor
administered several medications for headache prevention.  On
February 10, 2011, Chabot reported "only two migraines in a few
months," with a minor headache every two weeks.  The specialist
assessed her as "under fairly good control" and continued her

medications.

### c.  Emergency Room Visits

On April 26, 2010, Chabot presented at the emergency room
with constant and diffuse flank pain, "[a]t its maximum,
severity described as moderate."  The nurse practitioner opined
that Chabot was experiencing acute abdominal pain and low back
pain in the lumbar area with sciatica.  Chabot returned on May
12, 2010 reporting moderate pain in the right hip and thigh but
denying any injury.  An examination revealed moderate tenderness
and a limited range of motion in the hip and a full range of
motion and no tenderness in her neck and back.  X-rays of the
hip showed normal alignment and no fracture.  The doctor noted
that a muscle strain should be considered as causing her acute
thigh pain.

### d.  Physical Therapy

Chabot underwent physical therapy from October 28, 2009
until January 28, 2010.  She attended several appointments in
late October and cancelled her next several appointments before
resuming therapy in January 2010.  Because she had missed so
many appointments, the physical therapist expressed some
skepticism regarding Chabot's commitment to getting better.  See
Tr. at 435.  The therapist discharged Chabot with a good
prognosis, with seventy percent improvement in her range of

motion and upper extremity strength.  The therapist also
recommended that Chabot begin a home fitness program to retain
her strength.  Tr. at 506.

Chabot engaged intermittently in physical therapy through
the summer of 2010, but never for an extended period of time.
She began aquatic therapy on June 7, 2011 before transferring to
land-based therapy after complaining that the arm and shoulder
movements caused numbness and tingling in her arms.  She
continued with therapy through July 19, 2011.

2.  Medical Opinion Evidence

On July 28, 2009, Chabot underwent a Functional Capacity
Evaluation with Debra McAuley, an occupational therapist.
McAuley opined that Chabot could work at a sedentary physical
demand level with some ability to perform light work.  She was
able to sit for one hour continuously with minimal weight
shifting, neck rotation, and flexion, which was "significantly
greater than her perceived sitting tolerance of 15 minutes."
Chabot was able to stand continuously for fifteen minutes and
showed increased discomfort when performing a test where she had
to stand and look down.  Her walking tolerance was fifteen
minutes.

On September 28, 2010, Hugh Fairley, M.D., a state agency
physician, reviewed the available evidence of record and

12

completed a Physical RFC Assessment.  Dr. Fairley listed
Chabot's primary diagnosis as cervical and lumbar degenerative
disc disease and her secondary diagnosis as right shoulder
degenerative disease.  He noted that examinations indicated
clinical signs of right shoulder tendonitis, bursitis, and AC
joint osteoarthritis.  He opined that Chabot could frequently
lift/carry ten pounds; stand and/or walk two hours in an eight-
hour workday; sit six hours in an eight-hour workday;
occasionally balance, stoop, kneel, crouch, crawl, and climb
ramps or stairs; and never climb ladders, ropes, or scaffolds.
Dr. Fairley also opined that Chabot should avoid frequent
overhead reaching with her right arm and all exposure to
heights.  Dr. Fairley cited clinical examinations by Dr. Tilton
and other specialists in arriving at his decision.

On May 25, 2011, physician assistant Peter Attenborough
completed and Dr. Tilton signed a Physical RFC Assessment.  They
indicated that Chabot's pain would frequently interfere with
attention and concentration, even for simple work tasks.  They
further opined that Chabot could sit for fifteen minutes at a
time for a total of two hours in an eight-hour workday, stand
for ten minutes at a time for less than two hours of a workday,
and would need one to two unscheduled breaks every sixty
minutes.  They limited Chabot to occasionally lifting up to ten

13

pounds, turning her head right or left, and climbing stairs, and
noted that she should never climb ladders and only rarely look
up or down, hold her head in a static position, stoop, or
crouch/squat.  They indicated that in an eight-hour workday
Chabot could use her right hand for grasping or twisting objects
ten to fifteen percent of the time; her right fingers for fine
manipulation ten percent of the time; and her arms for reaching,
including overhead, five percent of the time.  They opined that
her impairments would likely produce good days and bad days, and
that her impairments would likely lead to more than four days of
missed work per month.

    3.  <u>Hearing and Personal Testimony</u>

        **a.  Function Report**

On May 5, 2010, Chabot submitted a Function Report
recounting her daily activities, which included: helping prepare
her child for school, going to doctor's or physical therapy
appointments, reading, watching television, feeding her pets,
making supper "when I'm not in severe pain," helping her son
with homework, then showering before going to bed.  She reported
problems getting comfortable due to neck, back, shoulder, and
hip pain, but no problems with personal hygiene.  She noted that
she can make "complete meals if I am not in too much pain," but
not meals with several courses.  She stated that she prepares

meals four days per week, can no longer bake due to back pain,
and needs her boyfriend to make dinner when she is in too much
pain. She reported that she does laundry twice per week, though
her boyfriend brings it to get dried, and she vacuums when
needed, though her boyfriend vacuums more often.  She noted that
she cannot lift a laundry basket and mows the lawn once every
two weeks.

Chabot stated that she leaves the home on a daily basis and
can do so alone.  She noted that she can drive a car, shop once
per month for groceries and toiletries, pay bills, and manage
savings.  She reported that she used to play guitar but can no
longer do so without pain.  Chabot's hobbies include reading,
watching television, listening to the radio, and using the
computer.  According to Chabot, she can complete these
activities on a daily basis without problems so long as she
frequently changes positions.

Chabot reported that she experiences difficulties with
lifting, squatting, bending, standing, reaching (especially
overhead), walking, sitting, kneeling, stair climbing, and
completing tasks, but indicated no difficulty with memory,
concentration, understanding, following instructions, or using
her hands.  She reported that she is able to lift ten pounds,
walk ten minutes before needing to rest for ten to fifteen

minutes, and sometimes bend over.  She noted that she is able to pay attention for one hour and follow instructions very well.

    **b.  Hearing Testimony**

On October 13, 2011, the ALJ asked Chabot for the "primary reason" she cannot return to work.  Chabot stated that "I have trouble sitting still."  She also noted that she could not look down for very long, that her "neck get[s] stuck in place," and that her "whole right side is kind of messed up."  Chabot testified that she is unable to lift her right hand over her head and cannot type because her wrists ache, her fingers go numb, and she cannot look at the screen.  She noted that she wears a wrist brace for her carpal tunnel syndrome.

Chabot next described her migraines, saying that when they arise she is hypersensitive to smell and needs to be isolated in a dark room for twelve hours.  These headaches occur once per month and incapacitate Chabot from when she wakes until six in the evening.

Chabot described her daily activities as waking up her son and getting him ready for school, taking a shower, sitting on the couch, speaking on the phone with her mother, and going to appointments with her mother.  Chabot stated that "I can drive for a little bit and that's why my mom goes with me because if I have too much trouble then she drives."  She claims to have

16

taught her dog "to pick things up for me or to help me take my jacket off because I can't get it off."  Her boyfriend "helps a lot as far as housework and laundry and dishes."

At the hearing a VE considered Chabot's past employment history.  The ALJ first asked the VE to consider a hypothetical individual "limited to sedentary exertional work with only occasional climbing ramps or stairs, no climbing ladders or scaffolds, occasionally balancing, crawling, stooping, kneeling crouching . . . [w]ith no overhead reaching the right arm" and a need to avoid workplaces with unprotected heights.  Based on this hypothetical, the VE opined that many of Chabot's prior jobs would remain available to a person with such limitations.

The ALJ next asked the VE the same hypothetical with a further limitation to work that is "simple and routine in nature."  The VE found that the hypothetical individual could do none of Chabot's prior work, but that there were limited available jobs for such a person in the national economy.

Returning to the original hypothetical, the ALJ asked the VE to consider individuals limited to frequent fingering, handling, and feeling with the right arm and hand.  The VE said that such a limit would not impede the individual from doing any of Chabot's prior work, but if the limit was reduced to occasional fingering, handling, and feeling, then "it would be

17

difficult to do those jobs." Even with this further limitation, however, the VE found jobs existing within the national economy, such as information clerk and surveillance systems monitor.

### 4. ALJ's Decision

Applying the sequential evaluation process for evaluating DIB and SSI claims as set forth in 20 C.F.R. §§ 404.1520(a)(4); 416.920(a), the ALJ found at step one that Chabot had not engaged in substantial gainful activity since her alleged disability onset date. At step two, the ALJ found that Chabot had the following severe impairments: cervical spondylosis with radiculopathy; lumbar disc protrusion; right shoulder bursitis with rotator cuff tendinopathy; and right carpal tunnel syndrome. He noted that Chabot alleged other impairments, including iliotibial band syndrome with right hip pain and migraines, but found no evidence of medically acceptable clinical or diagnostic techniques to support a conclusion of severity. He cited recent treatment notes to support a finding that "[t]he record lacks evidence that either of these impairments have the requisite effect on the claimant's ability to perform basic work activities." Tr. at 54.

At step three, the ALJ found that none of the impairments combined to meet or medically equal any of the Commissioner's Listing of Impairments. The ALJ then found that Chabot had the

RFC to perform

> sedentary work as defined in 20 CFR [§§] 404.1567(a)
> and 416.967(a) with only occasional climbing of ramps
> or stairs, no climbing of ladders or scaffolds,
> occasional balancing, crawling, stooping kneeling and
> crouching; with no overhead reaching with the right
> upper extremity; and she would need to avoid hazardous
> work places that involve moving machinery, unprotected
> heights or similar hazards.

Tr. at 55.  The ALJ found that the "objective medical evidence
does not support the claimant's allegations about the location,
magnitude, frequency, or resultant limiting effects of pain."
The ALJ next described evidence, ranging from MRIs to physical
examinations, to support his finding.  He acknowledged that
Chabot experienced pain in her daily activities, but noted that
overall "[h]er ability to perform these activities indicates a
capacity to function above a disabling level."  Tr. at 57.

     The ALJ next reviewed Dr. Fairley's medical source
statement.  After acknowledging that non-examining opinions as a
general matter do not deserve as much weight as examining
opinions, he nevertheless found that "this opinion does deserve
some weight, particularly . . . [because] there exist a number
of other reasons to reach similar conclusions (as explained
throughout this decision)."  He noted that Dr. Fairley's opinion
was grounded in a "careful consideration of the objective
medical evidence and the claimant's allegations regarding

symptoms and limitations," and accorded the opinion substantial weight.

The ALJ next considered Dr. Tilton's RFC, finding that "[t]he opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion and as discussed above is without substantial support from the other evidence of record, which renders it less persuasive."  Based on this reasoning, the ALJ gave the opinion "little weight."

At step four, the ALJ found that Chabot was capable of performing past relevant work as a collections representative, a receptionist, and an office manager.  The ALJ also made an alternative step five finding that Chabot could perform other work that exists in significant numbers in the national economy, citing the VE's testimony that Chabot could perform occupations such as Table Worker, Bench Hand Worker, and Order Clerk.  The ALJ noted that the VE's reasoning was partially based upon her professional experience in the field and that this personal knowledge, while going beyond that offered in the Dictionary of Occupational Titles, "enhances" any employment information provided therein.  The ALJ fully accepted the VE's testimony in arriving at his conclusion.

## II.   <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

Findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record. Irlanda Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

To determine whether an applicant is disabled, the ALJ follows a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). In the context of a claim for Social Security benefits, disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a). The applicant bears the burden, through the first four steps, of proving that his impairments exist and preclude him from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

### III.  ANALYSIS

Chabot presents two arguments challenging the ALJ's decision. She first argues that the ALJ erred at step two in determining that Chabot's diagnoses of right thoracic outlet syndrome, right iliotibial band syndrome with right greater hip trochanteric bursitis, and headaches were not severe. Chabot also argues that the ALJ's RFC is not supported by substantial

22

evidence.  I consider each argument in turn.

**A.   <u>Step Two Severity Findings</u>**

At the second step of the sequential analysis, the ALJ considers the medical severity of the claimant's impairments. If the ALJ finds that the claimant does not have a medically severe impairment, then he or she will find that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  Chabot's arguments here focus on the First Circuit's description of step two's severity requirement as a "de minimis policy, designed to do no more than screen out groundless claims." McDonald v. Sec'y of Health & Human Servs., 795 F. 2d 1118, 1124 (1st Cir. 1986); <u>see also</u> SSR 85-28, 1985 WL 56856, at *3-4 (1985).  Under this standard, Chabot argues, the ALJ impermissibly erred in finding that her right thoracic outlet syndrome, right iliotibial band syndrome with right greater hip trochanteric bursitis, and headaches were not severe.

Chabot's argument might have merit if the ALJ's inquiry had ended at step two.  This court has consistently held, however, that an error in describing a given impairment as non-severe is harmless so long as the ALJ found at least one severe impairment and progressed to the next step of the sequential evaluation. <u>See, e.g.</u>, Hines v. Astrue, No. 11-CV-184-PB, 2012 WL 1394396, at *12-13 (D.N.H. Mar. 26, 2012); Lawton v. Astrue, No. 11-CV-

189-JD, 2012 WL 3019954, at *7 (D.N.H. July 24, 2012); see also
SSR 85-28, 1985 WL 56856, at *3 (differentiating claims denied
at step two from those where "adjudication . . . continue[s]
through the sequential evaluation process").[16]  Had Chabot's
claim rested solely on her diagnoses of right thoracic outlet
syndrome, right iliotibial band syndrome with right greater hip
trochanteric bursitis, or headaches, then the ALJ should
arguably have deemed any of these impairments severe under the
First Circuit's de minimis standard.  See Baker v. Astrue, No.
10-cv-454-SM, 2011 WL 6937505, at *9 (D.N.H. Nov. 15, 2011),
rep. & rec. adopted 2012 WL 10284 (D.N.H. Jan. 3, 2012).  "But
where, as here, the ALJ found other severe impairments, and his
analysis proceeded to the determination of an RFC, his decision
not to deem [claimant]'s shoulder condition a severe impairment
was, at worst, a harmless error."  Id.

**B.   Residual Functional Capacity Finding**

Chabot also voices a second, more colorable, but ultimately
unmeritorious argument – that the ALJ's RFC determination is not
supported by substantial evidence.  Specifically, Chabot argues

---

[16] In Hall v. Astrue, upon which Chabot relies, the ALJ found no
severe impairment at step two and failed to continue through the
sequential evaluation process. No. 11-CV-134-JL, 2011 WL
6371875, at *6-7 (D.N.H. Nov. 29, 2011), rep. & rec. adopted sub
nom. Hall v. U.S. Soc. Sec. Admin., Comm'r, 2011 WL 6371369
(D.N.H. Dec. 19, 2011).

that the ALJ impermissibly failed to consider the ailments not found to be severe at step two in his RFC assessment.  Further, she claims that the ALJ's finding that she retained a sedentary RFC with occasional postural limitations is not supported by substantial evidence.  I consider each of these contentions in turn.

    1.  <u>The RFC Accounted for All of Chabot's Impairments</u>

An ALJ's RFC "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Stephenson v. Halter, 2001 DNH 154, 4-5.  If the ALJ acknowledged an ailment and then "deemed [it] to be non-severe, he was still required to consider [it] in determining claimant's RFC and in assessing whether she was precluded from performing her past relevant work." <u>Id.</u>; <u>see</u> 20 C.F.R. § 404.1523; SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").

The ALJ must generally consider non-severe impairments, but he or she is given considerable latitude in how he or she chooses to do so.  In <u>Hines</u>, this court found that the ALJ's citation to medical evidence of Hines's fibromyalgia in his decision was sufficient to suggest that he considered that

impairment when crafting his RFC, especially when the record contained "nothing to suggest that he did not." 2012 WL 1394396, at *13; see also Baker, 2011 WL 6937505, at *9 ("Here, the ALJ noted the medical evidence of Baker's shoulder condition in his decision . . . and also acknowledged her complaints of shoulder pain  . . . Thus, there is ample evidence in the record to suggest that the ALJ did consider Baker's shoulder condition when he determined her RFC, and nothing to suggest that he did not."); Shaw v. Astrue, 2011 DNH 213, 10-11 (finding that the ALJ's failure to discuss a mental impairment in his RFC determination was harmless since the ALJ posed several hypotheticals to the VE that included mental limitations).

This court has also emphasized that the claimant has the burden to show that any error at step two is outcome determinative. Lawton, 2012 WL 3019954, at *7 (error in finding given impairment non-severe at step two is considered harmless "unless the claimant can demonstrate that the error proved outcome determinative in connection with the later assessment of [her RFC]"); Shaw, 2011 DNH 213, 10-11 (same).

Here, the ALJ referenced each impairment in his decision. He did not discuss right thoracic outlet syndrome at step two, but extensively discussed Chabot's shoulder injuries during the hearing and in his RFC.  These considerations led the ALJ to

restrict Chabot by imposing "limitations in overhead reaching and a lifting restriction of ten pounds." See Tr. at 15, 56.

The ALJ also engaged in a lengthy discussion of Chabot's right iliotibial band syndrome with right greater hip trochanteric bursitis and headaches during his step two analysis, basing his findings on medical reports from Chabot's examining physicians. Tr. at 53-54. Here, as in Hines and Baker, there is substantial evidence in the record to suggest that the ALJ considered Chabot's hip and headache impairments in determining her RFC, and nothing to suggest that he did not.

2.   The ALJ Appropriately Weighed the Evidence of Record

Chabot's next argument centers upon the relative weight that the ALJ accorded to two medical opinions. She contends that the ALJ failed to accord sufficient weight to a treating physician's RFC opinion while giving too much weight to the RFC of the non-treating, state agency physician.

An ALJ is required to evaluate each medical opinion as part of "all of the relevant evidence." Generally, an ALJ should accord the greatest weight to the opinion of a claimant's treating source, less weight to an examining source, and the least weight to a non-examining source. See 20 C.F.R. § 404.1527. This general rule, however, is tempered by the ALJ's responsibility to resolve any conflicts in the evidence.

27

Irlanda Ortiz, 955 F.2d at 769.  In examining the record and
arriving at his decision, the ALJ can "piece together the
relevant medical facts from the findings and opinions of
multiple physicians."  Evangelista v. Sec'y of Health & Human
Servs., 826 F.2d 136, 144 (1st Cir. 1987).  An opinion from a
treating source can be accorded little weight - less than that
accorded a non-treating source - if the ALJ finds the opinion to
be inconsistent with other substantial evidence in the record.
SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996); see Keating v.
Sec'y of Health & Human Servs., 848 F.2d 271, 275 n.1 (1st Cir.
1988) ("It is within the [ALJ's] domain to give greater weight
to the testimony and reports of [non-examining] medical
experts."); Ferland v. Astrue, 2011 DNH 169, 10 ("[A]s a general
matter, an ALJ may place greater reliance on the assessment of a
non-examining physician where the physician reviewed the reports
of examining and treating doctors and supported his conclusions
with reference to medical findings." (internal quotation marks
omitted)).

    Should the ALJ find inconsistencies between the opinion and
other evidence in the medical record, however, he or she must
give "good reasons" for the weight assigned to the opinion and
apply a number of factors to any treating source's medical

opinion that is not given controlling weight.[17]  Sibley ex rel. Sibley v. Astrue, 2013 DNH 022, 16 & n.5 (citing Polanco-Quinones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012)).  I turn first to the ALJ's examination of Dr. Tilton's treating source opinion and then consider his examination of Dr. Fairley's non-examining source opinion.

> **a.  Dr. Tilton's Opinion**

Chabot contends that as a treating source, Dr. Tilton's opinion should have been accorded controlling weight, leading to a finding of disability.  Chabot declares the ALJ's consideration of Dr. Tilton's opinion to be "quite conclusory," stating that it "does not satisfy the requirement that he provide specific reasoning for affording little weight to her opinion."  The Commissioner contends that the ALJ thoroughly evaluated Dr. Tilton's opinion and reasonably assigned it limited weight due to its inconsistencies with other substantial evidence of record.  I agree.

An ALJ's decision must contain "specific reasons" for the

---

[17] The factors are: the length of the treatment relationship and frequency of examination; the nature and extent of the relationship; the extent to which medical signs and laboratory findings, and the physician's explanation of them, support the opinion; the consistency of the opinion with the record as a whole; whether the treating physician is a specialist in the field; and any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2-6).

weight given to a treating source opinion, supported by the evidence in the case record, "and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5; see also SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

Chabot focuses her argument on the paragraphs describing Dr. Tilton's and Dr. Fairley's medical source opinions, both of which are admittedly brief.  In doing so, however, she ignores earlier portions of the decision in which the ALJ cited to the record to support each of his findings.  These citations show notable inconsistencies between Dr. Tilton's opinion and other evidence in the record – including evidence gleaned from Dr. Tilton's own examinations and treatment notes.  They further provide evidence that the ALJ considered the required factors, especially the extent to which the opinion is supported by medical signs and laboratory findings and the consistency of the opinion with the record as a whole.  See 20 C.F.R. § 404.1527(c).

For example, in explaining his decision to omit Chabot's claims of hip pain and headaches as severe impairments, the ALJ cites to Dr. Tilton's treatment records from late 2011 for support.  These records include Dr. Tilton's opinion that Chabot's hip problems are either a soft tissue injury or symptomatic of her recurring back problems.  In considering Chabot's headaches, the ALJ cited headache specialist reports from February 2011 stating that her headaches only occurred several times per month as an explanation why any claims of severity were unsupported by the medical record.  Tr. at 53-54, 701.  In discussing the severe impairments concerning Chabot's back pain, shoulder pain, and wrist pain, the ALJ cited at length to the record, including to MRI examinations, x-rays, treatment notes, and notes of progress made in physical therapy. Tr. at 55-57.

Moreover, these observations are expressly incorporated into the ALJ's discussion of each medical source opinion.  The ALJ notes that Dr. Fairley's opinion "does deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision)," while noting that Dr. Tilton's opinion "as discussed above is without substantial support from the other evidence of record, which renders it less persuasive."

31

Tr. at 58 (emphases added).

To support her contention that Dr. Tilton's opinion should be given controlling weight, Chabot cites information from the record to support a finding of disability.  Her focus here misses the mark.  Although an ALJ cannot simply ignore the body of evidence opposed to his view, Dunn v. Apfel, No. Civ-98-591-B, 1999 WL 1327399, at *8 (D.N.H. Dec. 10, 1999), it is the ALJ's job to clearly consider a source's opinion and weigh it against any inconsistencies with the record evidence.  See, e.g., Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (per curiam).  The ALJ did so here.  Tr. at 53-57.

### b.  Dr. Fairley's Opinion

Chabot also argues that the ALJ afforded too much weight to Dr. Fairley's medical opinion.  She first contends that the ALJ should not have relied on Dr. Fairley's assessment because he submitted it over one year prior to the hearing and thus did not consider over one year's worth of record evidence in forming his opinion.

A medical opinion may not be accorded significant weight if it is based on a materially incomplete record.  Alcantara v. Astrue, 257 Fed. App'x 333, 334 (1st Cir. 2007).  Nevertheless, an ALJ is entitled to accord substantial weight to an RFC

32

opinion if the treatment notes postdating the medical source's assessment are available to the ALJ and document the same complaints of pain and clinical findings.  See Wenzel v. Astrue, 2012 DNH 117, 11-12; Ferland, 2011 DNH 169, 11 ("[A]n ALJ may rely on such an opinion where the medical evidence post-dating the reviewer's assessment does not establish any greater limitations, or where the medical reports of claimant's treating providers are arguably consistent with, or at least not clearly inconsistent with, the reviewer's assessment." (internal citations omitted)).

Here, most of Chabot's treatment and diagnoses post-dating Dr. Fairley's RFC were consistent with the state agency reviewer's assessment.  The record shows, however, that Chabot reported more frequent hip pain and headaches in the year post-dating Dr. Fairley's assessment, and that the assessment thus does not sufficiently consider these two alleged impairments, both of which the ALJ found to be non-severe.

Chabot began presenting with headaches in October 2010, and reported weekly migraines after experiencing a "snapping" sensation in her neck in November 2010.  By February 2011, however, Chabot reported only several migraines within the past few months, and a headache specialist assessed her as "under fairly good control."  Although an ALJ, as a layperson, may not

interpret medical data in functional terms without a supporting medical opinion, Nguyen, 172 F.3d at 35, he or she may permissibly make common-sense judgments about functional capacity based on medical findings, as long as he or she does not overstep the bounds of a layperson's competence and render a medical judgment. Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990).  Here, the ALJ permissibly cited to the specialist's findings that the headaches were under fairly good control, and Chabot's report that migraines had decreased to less than one per month, to find no severe impairment worth incorporating into his RFC.

Chabot's complaints of hip pain and diagnosis with greater trochanteric bursitis pre-date Dr. Fairley's assessment, but Chabot's additional reports of hip pain in 2011, and the treatment records surrounding them, could be seen as further medical findings.  Over the course of 2011, Dr. Tilton performed additional cortisone injections on Chabot's right hip, recommended that she enter therapy, and ordered an ultrasound of the hip, noting that "it appears to be more of a soft tissue injury."  After the ultrasound, Dr. Tilton diagnosed Chabot with "trochanteric bursitis and gluteus medius enthesopathy."

The ALJ relies on these 2011 reports in finding Chabot's bursitis to be non-severe.  Standing alone, determining that the

a soft tissue injury imposes no functional limitations might be viewed as an impermissible lay judgment.  Along with these findings, however, the ALJ relies on a medical opinion based on a September 2011 physical examination assessing Chabot's functionality.  At this examination, Dr. Tilton found Chabot's hip range of motion to be functionally intact, along with negative results for a straight leg test, full knee extension, and motion intact in the left hip.  Each of the functional findings at this examination was not limited, and there were no additional findings of functional limitations.  The ALJ permissibly relied upon this medical opinion, not Dr. Fairley's prior opinions, in discussing Chabot's hip impairments.  There was thus no error.

Chabot also contends that Dr. Fairley's analysis is brief, at best, and thus should not have been afforded substantial weight.  This argument also fails because, as explained above, the ALJ extensively discussed the medical record at large, and expressly incorporated these findings to support Dr. Fairley's medical assessment.

I emphasize that the record also contains substantial evidence supporting Chabot's allegations of disabling physical impairments, and I note that Chabot ably brings much of this information to my attention.  It is the ALJ's role, however, not

mine, to weigh and resolve conflicts in the evidence.  See
Rodriguez, 647 F.2d at 222 (citing Richardson v. Perales, 402
U.S. 389, 399 (1971)).  The record here could arguably justify a
different conclusion, Lizotte v. Sec'y of Health & Human Servs.,
654 F.2d 127, 129-31 (1st Cir. 1981), but the ALJ's decision in
assessing the medical opinions is supported by substantial
evidence.

## IV.   CONCLUSION

For the foregoing reasons, I grant the Commissioner's
motion to affirm (Doc. No. 11) and deny Chabot's motion to
reverse (Doc. No. 8).  The clerk is directed to enter judgment
accordingly and close the case.

SO ORDERED


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

May 20, 2014

cc:   D. Lance Tillinghast, Esq.
      T. David Plourde, Esq.